1

2

3

4

5

6

7

8                           IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FRANK R. SUMAHIT,

11              Plaintiff,                    No. CIV S-03-2605 FCD KJM P

12        vs.

13   CLAY PARKER, et al.,

14              Defendants.               FINDINGS & RECOMMENDATIONS

15   _____/

16              Plaintiff, who has been civilly committed as a sexually violent predator, is

17   proceeding pro se with a civil rights action under 42 U.S.C. § 1983.  He alleges that conditions at

18   Tehama County Jail during his periodic confinement in that facility violated his constitutional

19   rights.   Under California's Sexually Violent Predator Act, Cal. Welf. & Inst. Code §§ 6600,

20   et seq., a person who is alleged to fall within its provisions is returned to the county of his latest

21   criminal conviction for proceedings on a petition to have him declared to be a sexually violent

22   predator (SVP).  Cal. Welf. & Inst. Code § 6601.  Until 2006, one found to fall within the statute

23   was committed for a term of two years and so would be returned to the county in two year cycles

24   if further petitions were filed.  Cal. Welf. & Inst. Code § 6604 (2005).[1]

25   _____

26        [1]  The statute was amended by initiative on November 7, 2006, to provide for
     indeterminate terms.

1

1    In his second amended complaint, plaintiff alleges that the conditions at the jail

2    were punitive for a variety of reasons: he was often kept in the holding cell for many hours

3    during the booking process; he was subjected to strip searches; his mail was read; he was not

4    allowed to order books unless he donated them to the jail and could thereafter borrow them from

5    the library cart; there was no privacy in the shower or when using the toilet; his access to the day

6    room and the exercise yard was restricted; the clothing provided was in poor repair; the

7    transportation to and from Coalinga and Atascadero took an inordinate amount of time while he

8    was restrained and padlocked to another inmate; he suffered because he was labeled an SVP; he

9    was deprived of his high blood pressure medication on occasion; the bedding was torn; the

10   showers were often not sanitary; his telephone calls were monitored; the law library was

11   inadequate; the food was cold and was served to him in his cell; and his mental health needs were

12   not addressed.

13   Defendant Clay Parker, Tehama County Sheriff, has filed a motion for summary

14   judgment.

15   I.    Procedural Background

16   Plaintiff and two other civilly committed inmates filed this action jointly on

17   December 19, 2003.  The court severed the cases and directed plaintiff to file an amended

18   complaint.  Docket No. 5.   The court found this amended complaint appropriate for service on

19   defendant Parker and the Tehama County Board of Supervisors.  Docket No. 25.

20   Defendants filed a motion to dismiss.  This motion was granted as to plaintiff's

21   claims against the Board of Supervisors, but plaintiff was given leave to file an amended

22   complaint.   Docket Nos. 40, 44.   The second amended complaint did not name the Board of

23   Supervisors as a defendant and modified some of the claims against defendant Parker.

24   Defendants challenged the second amended complaint in a second motion to

25   dismiss.  This motion was granted as to plaintiff's claims that arose from his detentions in 1996

26   and 1998, as to several of plaintiff's claims that were deemed duplicative, and as to plaintiff's

1  Fifth Amendment claim.  Docket Nos. 59 & 64.  To the extent that plaintiff challenged

2  conditions in 2000 and 2002, the court denied the motion without prejudice to renewal upon a

3  more fully developed factual record.

4          Defendant Parker filed his answer on June 6, 2008 and has now filed the pending

5  motion.

6  II.    The Statute of Limitations

7          Defendant renews his statute of limitations argument as to plaintiff's claims

8  arising from conditions in 2000 and 2002.   In support of this argument, he asks the court to take

9  judicial notice of records in Sumahit v. Parker, Civ. No. S-01-0181 DFL DAD P.  This request is

10  appropriate and will be granted.  Estate of Blue v. County of Los Angeles, 120 F.3d 982,  (9th

11  Cir. 1997).

12          Because section 1983 does not contain a statute of limitations, federal courts

13  apply the forum state's statute of limitations for personal injury actions and incorporate the forum

14  state's law of tolling, both statutory and equitable, unless it is inconsistent with federal law.

15  Canatella v. Van De Kamp, 486 F.3d 1128, 1132-33 (9th Cir. 2007), cert. denied, __ U.S. __,

16  128 S. Ct. 669 (2007).  As of January 1, 2003, California's statute of limitations for personal

17  injury actions is two years; before that, it was a year.  Maldonado v. Harris, 370 F.3d 945, 954-55

18  (9th Cir. 2004); Cal. Civ. Proc. Code § 335.1.  However, because the amended statute is not

19  retroactive, "any cause of action that was more than one-year old as of January 1, 2003 would be

20  barred under the previous one-year statute of limitations."  Canatella, 486 F.3d at 1132-33.  A

21  cause of action accrues under federal law when the plaintiff knows or should have known of the

22  injury.  Id. at 1133.

23          California law includes a provision tolling the statute of limitations for a period

24  not to exceed two years because of imprisonment.  Cal. Civ. Proc. Code § 352.1; see Fink v.

25  Shedler, 192 F.3d 911, 914 (9th Cir. 1999).  By its terms, the statute does not apply to civil

26  detainees.  Jones v. Blanas, 393 F.3d 918, 927 (9th Cir. 2004).  Nevertheless, by applying

3

1  California's doctrine of equitable tolling, the Ninth Circuit has found that "a continuously

2  confined civil detainee who has pursued his claim in good faith" may take advantage of

3  tolling.  Id. at 930; see also Fink, 192 F.3d at 916 (requirements for equitable tolling in

4  California).  It is defendant's burden to prove that plaintiff filed his claims after the expiration of

5  the statute of limitations, but it is plaintiff's burden to show he is entitled to equitable tolling.

6  Payan v. Aramark Management Services Ltd. Partnership, 495 F.3d 1119, 1122 (9th Cir. 2007)

7  (statute of limitations); United States v. Marolf, 173 F.3d 1213, 1218 n.3 (9th Cir. 1999)

8  (equitable tolling).

9          Defendant has failed to show that the claims arising from plaintiff's 2002

10  confinement in Tehama County Jail are barred.  He has submitted the declaration of Yvette Clay,

11  a Lieutenant in the Tehama County Sheriff's Department, who avers that she is knowledgeable

12  about the conditions of plaintiff's confinement in the jail.  Yet Clay does not provide exact dates

13  of plaintiff's confinement and so has not suggested when the 2002 claims arose.  See Declaration

14  of Yvette Clay (Clay Decl.).  If plaintiff was housed in Tehama County in December 2002, his

15  claims would have accrued then and his original complaint would be timely without resort to

16  equitable tolling.

17          However, defendant has demonstrated that plaintiff's 2000 claims are barred.  In

18  the complaint filed in Sumahit v. Parker, Civ. No. S-01-0181 DFL DAD P, plaintiff averred that

19  he was housed in Tehama County Jail during May and June and again in September and October

20  2000.  Accordingly, even assuming that plaintiff was entitled to the additional two years of tolling

21  found appropriate in Jones, the statute of limitations on these claims expired by October 31, 2003.

22  These claims include the general conditions claims from 2000 and earlier as well as the specific

23  claim that plaintiff "suffered because of the SVP Lable [sic]. . . ."  Second Am. Compl. at 8:3-4.

24          In his deposition, plaintiff explained that during his earlier stays at Tehama County

25  Jail, he would be given a yellow arm band and housed in "Y-tank"; both of these things

26  demonstrated that he was a sex offender.  Deposition of Frank Rosas Sumahit (Sumahit Depo.) at

4

26:16-24, 27:20-23.  However, from 2000 through 2006, plaintiff does not recall having any sort of wristband or other feature identifying him as a sex offender or SVP.  Sumahit Depo. at 28:6-17.  Accordingly, to the extent plaintiff alleges he was singled out as an SVP, this claim is barred by the statute of limitations.

III.    Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

1   establish the existence of this factual dispute, the opposing party may not rely upon the allegations

2   or denials of its pleadings but is required to tender evidence of specific facts in the form of

3   affidavits, and/or admissible discovery material, in support of its contention that the dispute

4   exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must

5   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

6   suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

7   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

8   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

9   for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.

10  1987).

11          In the endeavor to establish the existence of a factual dispute, the opposing party

12  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

13  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

14  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

15  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

16  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

17  committee's note on 1963 amendments).

18          In resolving the summary judgment motion, the court examines the pleadings,

19  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

20  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

21  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

22  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

23  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

24  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

25  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

26  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

1   show that there is some metaphysical doubt as to the material facts . . . .   Where the record taken

2   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

3   'genuine issue for trial.'"   Matsushita, 475 U.S. at 587 (citation omitted).

4            On December 23, 2005, the court advised plaintiff of the requirements for

5   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.   See Rand v.

6   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc) and Klingele v. Eikenberry, 849 F.2d 409

7   (9th Cir. 1988).

8   IV.   Analysis

9            A.   Threshold Evidentiary and Other Matters

10            In support of his claim that he did not violate plaintiff's rights, defendant relies on

11   the certified copy of plaintiff's deposition and on a declaration from Lieutenant Clay.  This

12   declaration provides little if any support for several of defendant's claims, for it is often

13   conclusory, not clearly based on affiant's personal knowledge, or incorporates hearsay.   In

14   addition, Lieutenant Clay says that, as a lieutenant in the Tehama County Sheriff's Department,

15   she is "knowledgeable about the conditions of Frank Sumahit's confinement in Tehama County

16   Jail."   She does not explain whether that knowledge comes from her own observation or

17   experience or from reliance on records or both, though some of the averments almost certainly

18   come from her perusal of jail records, none of which are attached.   See, e.g., Clay Decl. ¶ 33 ("At

19   no time from 2002 through 2006 did Sumahit file a request to use the law library.").   The

20   declaration is supported only by two evaluations prepared in connection with the SVPA

21   proceedings against plaintiff; but there is no dispute about the basis for plaintiff's periodic

22   confinement in Tehama County Jail.   Indeed, Clay refers to these exhibits only to identify them.

23   Clay Decl. ¶¶ 73-74.

24            Nevertheless, the court may infer that Clay is competent to testify about jail

25   policies because of her rank as lieutenant.   Barthelemy v. Air Lines Pilots Ass'n., 897 F.2d 999,

26   1018 (9th Cir. 1990); In re Kaypro, 218 F.3d 1070, 1075 (9th Cir. 2000) (knowledge may be

1    inferred from declarant's position); but see Cermetek Inc. v. Butler Avpak, Inc., 573 F.2d 1370,

2    1377 (9th Cir. 1978) (proponent must show that affiant is competent to testify about matters in the

3    declaration).  Unless otherwise stated in the discussion below, the court will rely on this inference

4    in evaluating Clay's averments.

5            Material in an affidavit may be considered on summary judgment only if it would

6    be admissible if offered as part of the affiant's testimony.  Menes v. City University of New York,

7    578 F.Supp.2d 598, 611 (S.D. N.Y. 2008).  Hearsay is inadmissible on summary judgment to the

8    same extent it would be at trial, as is testimony not based on the affiant's personal knowledge of

9    the events detailed in the declaration.  LaFlamboy v. Landek, 587 F.Supp.2d 914, 922 (N.D. Ill.

10   2008) (hearsay); D.T. v. Somers Central School District, 588 F.Supp.2d 485, 494 n.13 (S.D.N.Y.

11   2008) (personal knowledge).

12           In this case, by way of example, Lieutenant Clay avers that the jail has passed all

13   food service inspections conducted by a dietician, but does not provide a declaration from the

14   inspector, a copy of the properly authenticated reports or other admissible evidence on this subject

15   and fails to explain what the inspection covers or how the jail's compliance with unspecified

16   criteria has any relevance to plaintiff's claims.  Clay Decl. ¶ 53; see also id. ¶ 42 (inspections

17   relating to clothing and sanitation).

18           Although plaintiff's opposition is submitted under penalty of perjury, it is similarly

19   conclusory and often offers nothing more than legal conclusions or quotes from case law.

20   However, there are a few factual assertions in that document, as well as in portions of the Clay

21   declaration and plaintiff's deposition, that aid in the resolution of the pending motion.

22           Because of the number of the claims in the second amended complaint, the court

23   sets out the undisputed facts and the analysis of the claim flowing from those facts in discrete

24   subsections below.   However, as background to all the claims, the court finds that between 2000

25   and 2006, plaintiff was a civil detainee in the Tehama County Jail, awaiting trial on petitions

26   alleging that he was a sexually violent predator.  Sumahit Depo. at 41:11-16.  In 2006, plaintiff

1    was housed primarily in the Special Housing Unit (SHU), which is a pair of single person cells

2    with a shared day room.  Clay Decl. ¶¶ 5, 7; Sumahit Depo. at 79:4, 79:15-17, 90:20.   From 2000

3    to 2005, plaintiff was housed in a unit called cellside, in a single cell or a cell shared with another

4    civil detainee; cellside is reserved for those held in protective custody.  Clay Decl. ¶ 7; Sumahit

5    Depo. at 91:1-8.  There were three tiers in cellside: one for the sex offenders, one for trouble

6    makers, and the other for civil detainees.  Sumahit Depo. at 92:3-7.

7             In addition,  some broad principles inform the analysis in this case.  In <u>Jones v.

8    Blanas</u>, 393 F.3d 918 (9th Cir. 2004), the Ninth Circuit clarified the standard under which courts

9    must analyze claims arising under the Fourteenth Amendment brought by civil detainees

10   challenging some conditions of confinement during commitment proceedings:  a civil detainee

11   awaiting adjudication is entitled to conditions of confinement that are not punitive.  <u>Id</u>. at 932.  A

12   restriction is punitive when it is intended to punish or is excessive in relation to its non-punitive

13   purpose, or is employed to achieve objectives that could be accomplished "in so many alternative

14   and less harsh methods."  <u>Id</u>. at 932.  Legitimate, non-punitive purposes include "ensuring a

15   detainee's presence at trial, maintaining jail security, and effective management of a detention

16   facility."  <u>Id</u>.

17            A rebuttable presumption of punitive conditions arises when an individual is

18   detained under conditions identical to, similar to, or more restrictive than those under which

19   pretrial criminal detainees are held or where the individual is detained under conditions more

20   restrictive than those he or she would face upon civil commitment.  <u>Id</u>. at 934.   The court in <u>Jones</u>

21   noted that a civilly committed inmate was entitled to "more considerate" treatment than criminal

22   inmates, <u>id</u>. (quoting <u>Youngberg v. Romeo</u>, 457 U.S. 307, 321-22 (1982)), and clarified that state

23   law "*demands* a 'less harsh method' of  confinement for SVPA detainees:  namely, holding them

24   separately from criminal detainees."  <u>Id</u>. (citing Cal. Penal Code §§ 4001, 4002(a); emphasis in

25   original).

26   /////

1        Not all claims brought by a civil detainee are subsumed in the substantive due

2  process analysis or are subject to the presumption of punitive conditions.  When an allegation

3  does not involve general conditions, the court will analyze the claim under the applicable

4  constitutional provisions and sometimes under a substantive due process analysis as well.  See,

5  e.g., Jones, 393 F.3d at 935-36 (analyzing free exercise, access to court claims separately); Warren

6  v. Kolender, 2009 WL 196114 (S.D. Cal. 2009) (detainee's opportunity to communicate with

7  counsel "is not properly described as a privilege for purpose of comparing his treatment with that

8  of prisoners"); Valdez v. Rosenbaum, 302 F3d 1039 (9th Cir. 2002) (telephone restrictions

9  analyzed under substantive due process and First Amendment).  Moreover, the Jones standard is

10  based on the Ninth Circuit's recognition that "civil detainees retain greater liberty protections than

11  individuals detained under criminal process. . ." and so applies generally to the conditions of

12  confinement that implicate the detainee's liberty.

13       B.    Access To The Courts

14        The Tehama County Law Library did not have all the books plaintiff needed for

15  his own legal pursuits. Sumahit Depo. at 42:17-19.   Because of the deficiencies, plaintiff could

16  not complete legal projects until he returned to Atascadero or Coalinga and so would have to ask

17  for extensions of time. Id. at 43:12-13, 19-21.  Despite the law library's deficiencies, plaintiff was

18  not prevented from filing anything. Id. at 46:15.

19        Plaintiff also complains about the monitoring of his legal mail and telephone calls.

20  Legal mail is checked for contraband and then sealed without being read. Id. at 71:1-5; Clay Decl.

21  ¶ 34.  Unmonitored legal calls were made from the law library.  Sumahit Depo. at 84:21-23.

22        An inmate has a constitutionally protected right of meaningful access to the courts.

23  Bounds v. Smith, 430 U.S. 817, 820-21 (1977).  However, there is no freestanding constitutional

24  right to law library access for prisoners.  See Lewis v. Casey, 518 U.S. 343, 350-51 (1996).

25  Instead, law library access serves as one means of ensuring the constitutional right of access to the

26  courts. See id. at 351.  A prisoner claiming that his right of access to the courts has been violated

1  due to inadequate library access must show that: 1) access was so limited as to be unreasonable,

2  and 2) the inadequate access caused actual injury.  Vandelft v. Moses, 31 F.3d 794, 797 (9th Cir.

3  1994).

4          A prisoner cannot make conclusory declarations of injury, but instead must

5  demonstrate that a non-frivolous legal claim has been frustrated or impeded.  To prevail, however,

6  it is not enough for an inmate to show some sort of denial: he must also show "actual injury" such

7  as the inability to file or dismissal of the suit resulting from the inadequacy of the law library.

8  Lewis v. Casey, 518 U.S. 343, 351 (1996).

9          Defendant has supported this section of his motion with plaintiff's deposition,

10 which shows that plaintiff was able to pursue legal remedies despite the inadequacies of the law

11 library.  Moreover, plaintiff's deposition shows that he was not prevented from maintaining

12 confidential communications with counsel whether by letter or by telephone.  Defendant is

13 entitled to summary judgment on this claim and to the corresponding request for injunctive relief.

14      C.    Restrictions On Religious Exercise

15         Plaintiff is Native American.  While he was in prison and again at Coalinga, where

16 he is housed after having been found to be an SVP, he can attend "native American groups, native

17 American circles that do our prayers and everything the native American way."  In Coalinga, he

18 has access to a Native American chaplain and to other Native American spiritual leaders.  Sumahit

19 Depo. at 30:9-12, 20–24.  While in Tehama County jail, plaintiff made verbal but no written

20 requests for Native American religious services, but none were available to him.  Id. at 31:19,

21 33:16-17, 34:1-3, 13-14.  According to Lieutenant Clay, Tehama County Jail policy permits

22 unlimited confidential visits from clergy, seven days a week from 7:00 a.m. to 11:00 p.m.  Clay

23 Decl. ¶ 44.  Requests for special religious services must be made in writing.  Id. ¶ 45.

24         To show a violation of the First Amendment right to the free exercise of religion, it

25 is not sufficient to show some impact on religious practices; rather, an inmate must show that "the

26 challenged governmental action infringes on a sincerely held religious belief," or, phrased another

11

1 way, the inmate must show that "his ability to practice his religion has been substantially

2 burdened." Gladson v. Iowa Department of Corrections, 551 F.3d 825, 831, 833 (8th Cir. 2009).

3        Plaintiff has not described how any restrictions on his access to Native American

4 religious services burdened his ability to practice his religion; in fact, apart from asserting that at

5 Coalinga he does "prayers and everything the native American way," he has not described why

6 access to such services is an important part of his only vaguely described practice of religion.

7 Defendant is entitled to summary judgment on this claim, including plaintiff's claim for injunctive

8 relief regarding the practice of religion.

9        D.    Medical And Mental Health Care

10        Plaintiff did not make a written request for mental health treatment in the jail, but

11 did ask a few times. Sumahit Depo. at 35:7-8. He believed that someone would talk to him about

12 his conditions of confinement as required by California Penal Code § 1610. Id. at 36:19-23.

13 Plaintiff did not have any mental health concerns while he was in the jail. Id. at 37:9-11.

14        On one occasion, a nurse did not provide plaintiff with his blood pressure

15 medication for three days because she did not know the procedure for handling medication that

16 accompanied an inmate from another institution. Id. at 40:1-5, 11-13. There were no other

17 problems with his medication while he was in Tehama County Jail. Id. at 41:6.

18        In his complaint, plaintiff alleges he was charged a $3.00 co-payment to visit the

19 doctor and sometimes had to purchase Tylenol "from the med. cart." Second Am. Compl. at 8.

20 Defendant does not address this claim.

21        Although civil detainees' medical care claims must be evaluated under Fourteenth

22 Amendment principles, "the Eighth Amendment still provides a floor for the level of protection

23 that SVPs must receive . . . and because the contours of the Eighth Amendment are more defined,

24 Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be

25 applied." Hubbs v. County of San Bernardino, 538 F.Supp.2d 1254, 1266 (C.D. Cal. 2008).

26 Under the Eighth Amendment, deficiencies in medical care rise to the level of an Eighth

1  Amendment claim only when they rise to the level of "deliberate indifference to serious medical

2  needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).  The Ninth Circuit has said:

3          [T]he plaintiff must show a serious medical need by demonstrating
        that failure to treat a prisoner's condition could result in further

4          significant injury or the 'unnecessary and wanton infliction of pain.'
        Second, the plaintiff must show the defendant's response to the need

5          was deliberately indifferent.  This second prong-defendant's
        response to the need was deliberately indifferent-is satisfied by

6          showing (a) a purposeful act or failure to respond to a prisoner's
        pain or possible medical need and (b) harm caused by the

7          indifference. Indifference may appear when prison officials deny,
        delay or intentionally interfere with medical treatment, or it may be

8          shown by the way in which prison physicians provide medical care.

9  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations & quotations omitted).

10        Plaintiff has admitted he had no mental health needs while at Tehama County Jail

11  and so has not shown he had a serious medical need.[2]  Moreover, the single instance of confusion

12  about the blood pressure medication accompanying plaintiff from Atascadero does not state an

13  Eighth Amendment claim: plaintiff has made no showing that the nurse's misunderstanding of

14  procedures was a purposeful act.  See Brewer v. Blackwell, 836 F.Supp. 631, 644 (S.D. Iowa

15  1993).

16        Finally, the fact that plaintiff was charged a modest co-pay for medical visits and

17  sometimes had to purchase Tylenol does not state a claim under the Civil Rights Act:  plaintiff has

18  not alleged he was denied care or was otherwise harmed by having to chip in for the cost of his

19  medical care.  Shapley v. Nevada Board of State Prison Commissioners, 766 F.2d 404, 408 (9th

20  Cir. 1985) (no claim arising from imposition of co-pay when no allegation of denial of medical

21  treatment); Reynolds v. Wagner, 936 F.Supp. 1216, 1224 (E.D. Penn. 1996) (requiring co-pays

22  from sentenced prisoners and pretrial detainees did not violate the constitution).

23  /////

24  /////

25

26     [2]  Plaintiff's reliance on California Penal Code § 1610 is puzzling, for that section applies
only to mentally disabled offenders whose outpatient status has been revoked.

1        E.        Mail And Telephone

2        Plaintiff contends that guards read all of the outgoing and incoming non-legal mail,

3 but does not describe how he has learned of this.  Sumahit Depo. at 69:20-21.  Lieutenant Clay

4 avers that mail is inspected for contraband, but says jail staff does not read incoming or outgoing

5 mail.  Clay Decl. ¶ 34.  This is done, she says, "for the protection  and security of jail personnel

6 and the inmates."  Id.  In the state facilities at Coalinga and Atascadero, plaintiff says he is able to

7 send and receive mail without it being read.  Opposition (Opp'n) at 15.

8        Inmates and, by extension, civil detainees, have the right to communicate with

9 people outside the jail.  Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002).  In this case,

10 however, defendant has offered evidence showing the jail does not read outgoing and incoming

11 mail.  Plaintiff's assertion that guards read the mail is not based on personal knowledge, and so

12 does not raise an issue of fact in opposition to summary judgment.  Joseph P. Caulfield &

13 Associates, Inc. v. Litho Products, Inc, 155 F.3d 883, 888 (7th Cir. 1998).

14        Telephones for general calls are located in the dayrooms.  Sumahit Depo. at 84:7-8.

15 Calls from these telephones are monitored; inmates are informed of this in the jail orientation

16 book.  Clay Decl. ¶ 55.  According to Lieutenant Clay:

17              The jail has a security interest in monitoring non-legal telephone
              conversations as these conversations may have safety considerations
18              for the jail.   The monitoring of telephone calls helps to discourage
              and minimize plots to injure staff, witnesses and other inmates.  It
19              deters escape plans and the smuggling of contraband and weapons
              that could be planned or arranged via the telephone.
20

21 Id. ¶ 57.  Clay claims that plaintiff signed something she characterizes as a "waiver," which

22 acknowledged that the calls were monitored; as she does not attach a copy to her declaration, the

23 court cannot determine what, if anything, plaintiff allegedly waived.  Id. ¶ 55.  In addition, she

24 avers that "[t]here is no practical way to provide an unmonitored phone to a SVP in a day room."

25 Id.

26 /////

14

1    Whether considered under a substantive due process or a First Amendment

2    analysis, defendant is not entitled to summary judgment on plaintiff's claim that his telephone

3    calls were monitored.  Defendant has offered Lieutenant Clay's conclusory statement that the

4    monitoring is justified by security concerns.  However,

5            [p]rison authorities cannot rely on general or conclusory assertions
             to support their policies.  Rather, they must first identify the specific
6            penological interest involved and then demonstrate both that these
             specific interests are the actual bases for their policies and that the
7            policies are reasonably related to the furtherance of the identified
             interests.

8

9    Walker v. Sumner, 917 F.2d 382, 386 (9th Cir. 1990); see also Caldwell v. Miller, 790 F.2d 589,

10   598 (7th Cir. 1986) ("the governmental interest asserted in support of a restrictive policy must be

11   sufficiently articulated to allow for meaningful review of the regulation in question and its effect

12   on the inmate's asserted rights.").  If there is a written policy, defendant has not provided it or

13   anything linking the monitoring of SVPs' telephone calls to institutional security.  Lieutenant Clay

14   has not suggested that civil detainees present the same security concerns that prompted the

15   monitoring of other detainees' phone calls.  Nor has she suggested the policy was adopted in

16   response to specific concerns or experiences.

17   In addition, Clay has averred that it is not possible to provide unmonitored calls to

18   SVP, but has not explained how the monitoring works or whether it would be possible to squelch

19   the automatic recording (assuming it is automatic) of calls when SVPs occupy the dayroom by

20   themselves.

21   These conclusions inform the resolution of the First Amendment issues as well, for

22   a regulation that infringes an inmate's First Amendment rights "is valid if it is reasonably related

23   to legitimate penological interests."  Valdez, 302 F.3d at 1048 (internal quotations omitted).  As

24   explained, defendant has not adequately established the relationship between the monitoring and

25   legitimate penological objectives.

26   /////

1       F.     <u>Restraints And Transportation To Court</u>

2       When plaintiff left the jail for any reason, he was restrained with belly chains,

3 handcuffs and ankle shackles.  Sumahit Depo. at 46:25-47:1.  Plaintiff thought he should be able

4 to walk, unrestrained, to court.  <u>Id</u>. at 50:16-17.  However, Tehama County Jail's policy is to

5 restrain "all inmates regardless of classification for transportation to and from . . . the courthouse

6 to ensure . . .safety. . . ."  Clay Decl. ¶ 39.

7       For some period of time, plaintiff often was transported to court with penal

8 inmates, but he was placed at the end of the line of prisoners; plaintiff claims this occurred

9 through 2002 while Clay avers it was before 2000.  Sumahit Depo. at 47:24-48:1; Clay Decl. ¶ 40.

10 After that, plaintiff would be transported separately, but still restrained.  Sumahit Depo. at 48:2-3,

11 23, 49:3.

12       In <u>Youngberg v. Romero</u>, 457 U.S. 307 (1982), the plaintiff, a civilly committed

13 inmate, was placed in restraints for a portion of each day to protect both the plaintiff and others

14 around him.  <u>Id</u>. at 310-11.  He challenged this practice and some other conditions of his

15 hospitalization.  The Supreme Court recognized that courts must "make certain that professional

16 judgment" as to the conditions of detainees' confinement was exercised.  <u>Id</u>. at 321; <u>West v.</u>

17 <u>Schwebke</u>, 333 F.3d 745, 748 (7th Cir. 2003) (inmates committed as sexually violent may be

18 isolated and restrained if professional judgment on security has been exercised).

19       The only justification for shackling plaintiff on trips to and from court is Clay's

20 declaration describing the policy as it applies to all inmates.  Nothing in her declaration suggests

21 that jail authorities considered whether inmates detained pending SVP proceedings posed the

22 same security risks as penal inmates and thus should be subject to the same security routine.  As in

23 <u>Walker</u>, defendant relies on Clay's general assertion that security justifies subjecting plaintiff to

24 the same restraints as penal inmates; nothing suggests that defendant actually exercised his

25 professional judgment in making this determination.  Defendant is not entitled to summary

26 judgment in this respect.

1    However, defendant is entitled to summary judgment on plaintiff's claim that on

2 occasion, he was taken to court with the penal detainees; the court has found no case holding that

3 transporting SVPs with other detainees violates the rights of the SVPs. See Sundquist v. Philp,

4 2008 WL 859452 at 5 (N.D. Cal. 2008).

5    G.    Strip Searches[3]

6    On each occasion when plaintiff returned to the jail from the state hospital, he was

7 subjected to a body cavity search in the holding cells, or in the stairway by the property room if

8 the holding cell was full. Sumahit Depo. at 56:23-25. Female officers did not participate, but on

9 several occasions were standing outside the door. Id. at 56:1-10, 14-16, 57:3, 13-14, 58:2-5; Clay

10 Decl. ¶¶ 22-23.

11    Plaintiff testified he was subjected to strip searches before he went and after he

12 returned from court, but was not sure whether that was before or after 2000. Sumahit Depo. at

13 63:1-9, 22-24.

14    Deputy Clay describes the Tehama County policy:

15    The Tehama County Jail has a policy of conducting a strip search on
     inmates who arrive at the Jail from outside or on transfer from
16   another facility.   The strip search policy is necessary to maintain
     security at the Tehama County Jail. Tehama County Jail has found
17   that inmates who have traveled outside of the facility have an
     opportunity to and do on occasion obtain contraband and attempt to
18   bring it into the facility.   The Jail has found that strip searches are
     necessary to prevent these actions.
19
     A strip search . . . will be conducted in a private place by a deputy
20   or deputies of the same gender as the inmate.

21 /////

22 /////

23

24    [3] In his deposition, plaintiff described random cell searches, but did not challenge this
   practice in his second amended complaint. Sumahit Depo. at 59:18-24; compare Second Am.
25 Compl. (docket no. 53) at 6. Clay describes the cell search policy in her declaration and
   defendant has addressed it in the motion for summary judgment. Clay Decl. ¶¶ 27-30; MSJ at
26 15. Because this claim was not included in the complaint, the court declines to address it here.

1    The Tehama County Jail has found that the most effective way to
     detect and deter inmates from bringing contraband into the Jail is
2    through the consistent use of a strip search policy.  The strip
     searches are effective and act not only as a deterrent to such
3    behavior, but have resulted in the recovery of contraband and
     weapons . . . from inmates returning from Court visits or arriving at
4    the Jail from inter-facility transfers.

5    As Sumahit has been incarcerated a number of times, he is not naive
     in my judgment to the processes by which inmates can attempt to
6    smuggle contraband into a Jail facility.  The planned nature of
     Sumahit's transportation from Atascadero or Coalinga State
7    Hospital to the Tehama County Jail would allow him time to plan
     and organize an attempt to smuggle contraband into the jail if he
8    was so inclined.

9    Clay Decl. ¶¶ 22-25.

10          As the Supreme Court has recognized, strip searches certainly "invade the personal

11   privacy of inmates" and so "must be conducted in a reasonable manner."  Bell v. Wolfish, 441

12   U.S. 520, 560 (1979).  However, "so long as a prisoner is presented with the opportunity to obtain

13   contraband and a weapon while outside of his cell, a visual strip search has a legitimate

14   penological purpose."  Michenfelder v Sumner, 860 F.2d 328, 333 (9th Cir. 1988) (sentenced

15   inmates); Davis v. Peters, 566 F.Supp.2d 790, 815 (N.D. Ill. 2008) (SVP inmates).  Moreover, "in

16   the absence of substantial evidence in the record to indicate that the officials have exaggerated

17   their response to these considerations, courts should ordinarily defer to their expert judgment in

18   such matters."  Bell, 441 U.S. at 540 n.23 (internal quotes omitted).  This court must analyze the

19   searches under both substantive due process and Fourth Amendment standards.  Byrd v. Maricopa

20   County Sheriff's Department, 565 F.3d 1205 (9th Cir. 2009).

21          Because plaintiff was subjected to the same strip search policy as penal inmates,

22   the policy is deemed to be punitive.  Jones, at 934.  Nevertheless, defendant has presented

23   evidence showing that the policy was adopted as a means of controlling the flow of contraband

24   into the jail and that strip searches are conducted even of SVPs because of the opportunity for

25   those who, like plaintiff, are "not naive" to bring contraband into the jail.  Clay Decl. ¶¶ 24-25.

26   Plaintiff has not countered this evidence with anything showing he would have no opportunity to

1   secure and secrete contraband before leaving Atascadero or Coalinga, or that defendant would be

2   aware of any such inability, or any other evidence showing that defendant's response is

3   exaggerated to the security concerns prompting adoption of the policy.   On this record, defendant

4   has overcome the presumption that the condition is punitive.

5            As Bell recognized, a court must determine whether a search is "reasonable"

6   within the meaning of the Fourth Amendment by considering four factors: (1) the scope of the

7   intrusion, (2) the manner in which it is carried out, (3) the justification for the search, and (4) the

8   place in which it is undertaken.   Bell, 441 U.S. at 559.   In addition, this court must consider

9   whether the strip searches are related to a legitimate penological objective.   Byrd 565 F.3d at

10  1221.

11           As in Bell and Byrd, defendants have presented evidence that strip searches are

12  conducted for reasons of institutional security, something that plaintiff has not countered.  This is

13  a legitimate penological objective.  Michenfelder, 860 F.2d at 333; see also Bell, 441 U.S. at 559.

14  Moreover, the scope of the search, though intrusive, was reasonable under Bell because it was

15  justified by defendant's policy of preventing the introduction of contraband.   Moreover, the

16  searches were usually conducted in the holding cell, and plaintiff has presented no evidence that

17  others could observe those searches conducted in the stairwell.   In addition, although female

18  deputies were sometimes present outside the holding cell, plaintiff has presented  no evidence that

19  they observed or participated in the searches, or any other evidence suggesting that the manner in

20  which the searches were conducted rendered them unreasonable.

21           Finally, defendant has presented evidence that the consistent strip search policy has

22  a deterrent effect on the flow of contraband into the jail, a showing that plaintiff has not rebutted.

23  The policy is not an exaggerated response to the problem.   Defendant is entitled to summary

24  judgment on this issue.

25  /////

26  /////

H.     Privacy

The shower in the SHU dayroom was close to the nurse's station and so people

lining up to see the nurse, including female inmates, could look right into the dayroom and into

the shower.  Sumahit Depo. at 97:20-23.  According to Sumahit, there is no shower curtain, but

some blinds were put on the window in 2006; according to Lieutenant Clay, a shower curtain has

been in place since 2000.  Sumahit Depo. at 97:25-98:6; Clay Decl. ¶ 64.  Because Sumahit was

housed in the SHU only in 2006 and the blinds were installed by that year, plaintiff's claimed lack

of privacy while showering is unfounded, despite the dispute over the presence or absence of a

shower curtain.

The shower in the cellside dayroom was also out in the open, with only half doors,

and so someone in the shower could be seen from the tower and from some of the cells.  Sumahit

Depo. at 102:2-7; Clay Decl. ¶ 60.  There are frequently female deputies in the tower.  Sumahit

Depo. at 103:4-6.  In addition, the toilets in cellside are right by the door, so a female deputy

making rounds could look in as she walked by.  Id. at 104:4-13.

On this issue, Lieutenant Clay says:

> . . . The Jail has found SVP detainees are a risk to be storing
> contraband or other prohibited items.  The Jail has a security
> interest in making sure that inmates regardless of their classification
> are not storing contraband or other items in their cells against Jail
> policy.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> The Tehama County Jail has a policy and practice of periodically
> monitoring inmates, the cells and day rooms in order to observe
> inmates and their actions to control and prevent the storage and
> passing of contraband and to prevent other safety and security
> violations within the Jail.  The Jail conducts monitoring of inmates
> from centrally located guard stations and from periodic unscheduled
> walkthrough inspections of inmate housing facilities.  The ability to
> monitor inmates' actions is important to ensure that the inmate
> behavior is not contrary to safety of the facility, Jail personnel or
> inmates.  Monitoring the inmates including when they are in their
> cells, showers and toilets, is important because at any of these times

> an inmate could be creating a weapon, harming himself or others,
> and hiding or retrieving contraband.  The observations made by jail
> personnel through the windows in the cells, or through general
> supervision of the shower and day room areas are the least intrusive
> means to achieve the objective of monitoring the inmates for
> activities that could be detrimental to the safety and security of the
> inmates, the staff and the facility.
>
> The deputies in the guard tower at the cellside housing unit are
> more than 50 feet away from the shower area, and each shower has
> a solid metal half-door that provides privacy for the inmates.
>
> The observation windows in the cells in cellside are such that Sumahit
> would not easily be seen while using the toilet or changing.  It would take a
> purposeful effort by a deputy. . . .to observe Sumahit. . . .
>
> The SHU accommodations provided Sumahit with more privacy in
> general as deputies cannot see into the individual cells.
>
> The SHU day room area is observable from the nursing station so
> that medical staff could keep an eye on an injured inmate . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Any lack of privacy in Sumahit's conditions of confinement stem
> [sic] from the interest of the jail in providing for the safety and
> security of the jail's inmates and staff.

Clay Decl. ¶¶ 28, 59-65.  Clay does not explain how she knows a deputy would have to engage in

"purposeful" behavior in order to see into a cellside cell and so this portion of her declaration will

not be considered.  Nevertheless, defendant is entitled to summary judgment on this claim.

        In Sepulveda v. Ramirez, 967 F.2d 1413 (9th Cir. 1992), the Ninth Circuit rejected

a parole officer's claim that he was entitled to qualified immunity for a claim that he walked into

bathroom stall where a partially clothed female parolee was providing a urine sample.  It noted,

however, that when a correctional official's view was "generally obscured and from a distance,"

the result might be different.  Id. at 1415-16; but see Somers v. Thurman, 109 F.3d 614 (9th Cir.

1997) (female guards who observed male prison inmate in the shower entitled to qualified

immunity).  In addition, the Seventh Circuit had rejected pretrial detainees' challenge to the use of

female guards to monitor male detainees, finding that the practice was reasonable under the

/////

1  Fourth Amendment and did not violate due process.  Johnson v. Phelan, 69 F.3d 144, 146-47 (7th

2  Cir. 1995).

3         In this case, plaintiff has not pointed to any specific instance of a female guard

4  observing him on the toilet and even he appears to concede that any such observation would be

5  fleeting.  Moreover, plaintiff acknowledges that the showers in cellside were screened by a half

6  door and while someone in the tower may be able to see a showering inmate, plaintiff has

7  presented nothing suggesting that a tower officer would be able to see an inmate's genitals or that

8  any such view would be clear.  Defendant has presented evidence that the monitoring was

9  undertaken for safety reasons because inmates can engage in harmful activities even when in the

10  shower or using the toilet.

11         As with the strip searches, defendant has overcome the presumption that the

12  monitoring of civil detainees was punitive by showing that it is undertaken to promote

13  institutional safety.  Moreover, he has shown that any Fourth Amendment intrusion is reasonable,

14  because any observations are fleeting, obscured and brief and undertaken for the legitimate

15  penological objective of protecting inmates and staff and stemming the flow of contraband into

16  the institution.  See Bell, 441 U.S. at 559; Byrd, 565 F.3d at 1221.

17         In the second amended complaint, plaintiff suggests he had no privacy in medical

18  records or in therapy sessions, but does not identify any therapy he received or medical records

19  which were leaked.  Second Am. Compl. at 11.  Clay avers that an inmate's medical records are

20  available only to "staff members who must respond to any emergency involving Sumahit.  Their

21  knowledge of his medication usage and dosage is essential in responding to a medical

22  emergency."  Clay Decl. ¶ 68.  As plaintiff has not countered this averment, his contention is

23  unavailing.

24         Defendant is entitled to summary judgment on this claim.

25  /////

26  /////

22

1       I.      Transportation To And From Coalinga and Atascadero

2           When plaintiff was moved between Coalinga or Atascadero and Tehama County,

3 the transportation was undertaken by Transcor rather than by the Sheriff's Department. Sumahit

4 Depo. at 118:20-24, 119:4-6; Clay Decl. ¶ 38. Plaintiff has presented no evidence suggesting that

5 defendant had any control over the manner in which Transcor undertook its contracted-for

6 responsibilities. See Arnold v. International Business Machines Corporation, 637 F.2d 1350,

7 1355 (9th Cir. 1981) (causation is an element of § 1983 action). Defendant is entitled to summary

8 judgment on this claim.

9       J.     Booking

10          Several times during the booking process, plaintiff was retained in the holding cell

11 in his underwear for five or six hours; often the intercom did not work and it was hard to get

12 anyone's attention. Sumahit Depo. at 68:2-14. According to Clay, "if Sumahit was required to

13 remain in a holding cell for an extended period during booking it was due to the need to clear a

14 protective custody cell . . . and to ensure that he was not exposed to contact with penal inmates."

15 Clay Decl. ¶ 37. She does not explain the basis of her knowledge, and therefore the court will not

16 consider this section of her declaration.

17          Nevertheless, defendant is entitled to summary judgment on this claim. Apart

18 from testifying that he had trouble reaching the intercom and was often left in his boxer shorts,

19 plaintiff does not allege that he suffered any harm from his inability to contact jail officials or that

20 the conditions deprived him of the "minimal civilized measures of life's necessities." Frost v.

21 Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998) (quoting Hudson v. McMillian, 503 U.S. 1, 9

22 (1992)).

23       K.    Outdoor Exercise And Dayroom Access

24       1.  SHU

25          In SHU, plaintiff was free to stay in his cell or go into the dayroom until 11:00

26 p.m., when he was locked in his cell. Sumahit Depo. at 86:5-9, 14-15; Clay Decl. ¶ 5. Although

1   the SHU dayroom is small, there is room to exercise.  Sumanit Depo. at 87:20.  In addition,

2   magazines and some games were available, as well as a telephone and televison. Id. at 87:11-15,

3   83:21-25.  When there was more than one civil detainee in SHU, these detainees would have joint

4   access to the dayroom and be able to interact.  Id. at 82:2-10.  Plaintiff testified he was taken to

5   the exercise yard once a week.  Id. at 89:1-5.  Clay avers that "regardless of Sumahit's housing, he

6   was always part of a scheduled rotation for use of the exercise yard.  This schedule provided that

7   he received outdoor recreation weather permitting three days a week."  Clay Decl. ¶ 13.

8          Defendant is entitled to summary judgment on plaintiff's claims based on his SHU

9   dayroom access.  Plaintiff agrees that when he was in SHU, he had unlimited access to the

10  dayroom from early in the morning until 11:00 p.m., something the other inmates did not receive.

11  Sumahit Depo. at 86:5-9.

12         However, defendant is not entitled to summary judgment on plaintiff's claim that

13  he did not receive sufficient outdoor exercise while he was in the SHU.  First, there is a dispute

14  about the frequency with which plaintiff was taken to the exercise yard.  Second, plaintiff was

15  treated the same as penal inmates in this regard, which gives rise to the presumption that this

16  condition was punitive.  Defendant offers Clay's opinion that "[i]t was not possible to segregate

17  Sumahit from the penal detainees at the Tehama County Jail without restricting some of his

18  privileges, otherwise the jail would not be able to properly provide for his security."  Clay Decl.

19  ¶ 14.  Even conceding the jail's obligation to keep plaintiff safe and plaintiff's refusal to sign a

20  waiver for placement in general population, as was his right, Clay has said nothing about the

21  general nature of the rotations into the exercise yard, the length of time each group would spend in

22  the yard, or the number of jail personnel required for each rotation.  Instead, she rests only on the

23  conclusory claim that because other inmates were entitled to use the yard, plaintiff had to join into

24  the general rotation without regard to his status as a civil detainee.

25  /////

26  /////

2.  Cellside

When plaintiff  was in cellside, he had access to the dayroom for one hour in the morning, either alone or with other civil detainees, because the other inmates were given access at other times during the day.  Sumahit Depo. at 80:21-24, 81:3-9; Clay Decl. ¶¶ 11-12.  The dayroom available to cellside inmates had telephones, television, shower, tables and some exercise equipment, magazines, a chess set and some cards: the day room was larger than SHU. Id. at 93:2-4, 11, 22-23.  There is a small exercise yard by cellside, but plaintiff's access depended on the weather and the availability of officers because he could not use the yard at the same time as the penal inmates.  Id. at 88:7-13; Clay Decl. ¶ 12.  He was able to get outside perhaps once a week.  Sumahit Depo. at 89:1.  Even so, he got more access to the yard when he was cellside  than when he was in SHU.  Id. at 95:21-24, 96:11-15.

Clay concedes that "Sumahit's out-of-cell time while in cellside is restrictive."

. . . This is due to the need to allow Sumahit to use the day room and exercise facility without penal inmates present.  While housed in cellside Sumahit would be given extra time in the day room and/or exercise yard when the population of the jail allowed the staff to provide an extra rotation to these areas.  There is no other way to provide Sumahit with more considerate treatment as the other inmates in cellside also had a right to use the day room. . . .

. . . .The civil detainees' access to the exercise yard was scheduled based on the jail's yard rotation schedule and weather conditions.

Regardless of Sumahit's housing, he was always part of the scheduled rotation for use of the exercise yard.  This schedule provided that he received outdoor recreation weather permitting three days each week.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . .[H]is day room and exercise facility use at cellside was increased whenever possible.

Clay Decl. ¶ 11-15.

Because plaintiff was subjected to the same day room and exercise yard restrictions as the penal inmates in cellside, the court presumes that these conditions were punitive.

1   Defendant has not rebutted the presumption.  Clay maintains that plaintiff was housed cellside in

2   2002 and 2004 because "the SHU was unavailable to house Sumahit from 2002 through 2005 as it

3   was occupied by a high-security pretrial criminal detainee who had killed a law enforcement

4   officer.  The Jail determined that this inmate must be housed separately from all other inmates.

5   The SHU was the only housing that served that purpose."  Id. ¶ 7.  She does not explain why jail

6   officials concluded that this inmate had to be housed separately, nor does she provide any

7   information about the configuration of the jail to support the conclusion that the SHU was the

8   only appropriate housing for this inmate.  In fact, defendant has presented almost nothing about

9   the lay-out of the jail itself or anything other than Clay's conclusory declaration that when the

10   SHU was unavailable, the only way to isolate plaintiff was to house him cellside, with its

11   restrictive conditions of confinement.  As in Walker, 917 F.2d at 386, defendant has offered only

12   conclusory allegations that the cellside restrictions were justified by legitimate non-punitive

13   purposes.  See generally Pierce v. County of Orange, 526 F.3d 1190 (9th Cir. 2008) (restrictions

14   on exercise justified only by generalized reference to security concerns).

15        L.    Clothing and Bedding

16        The clothing exchange at the jail would follow a rotation and cellside and SHU

17   were often last, which meant that plaintiff's size often was not available.  Sumahit Depo. at 111:7-

18   12.  In addition, on occasion, plaintiff had to wear the same jumpsuit for two weeks and had to

19   wash his underwear in the sink when underclothing was not exchanged.  Id. at 111:18-20.

20        Mattresses and sheets frequently had holes.  Id. 112:21-23.  Linens would be

21   exchanged once a week.  Id. at 113:2.

22        According to Clay, clothing was changed twice a week and linens were changed

23   once a week.  Clay Decl. ¶ 41.  She does not address the state of the mattresses or the clothing.

24        Although there is some dispute about the frequency of the clothing and linen

25   exchange, it is not material.  Inmates are entitled to adequate clothing and adequate means of

26   keeping them clean.  Divers v. Department of Corrections, 921 F.2d 191, 194 (8th Cir. 1990);

1    Wilson v. Cook County Board of Commissioners, 878 F.Supp. 1163 (N.D. Ill. 1995) (pretrial

2    detainee stated a claim when he alleged his uniform had not been changed in a month).  Here,

3    however, plaintiff alleges one instance of a failure to exchange clothing for two weeks, but

4    concedes he had the ability to wash his clothing himself.  Moreover, substantive due process does

5    not incorporate a sartorial standard, so plaintiff's claim of ill-fitting clothing, without more, is

6    unavailing.  These circumstances do not constitute punitive conditions.

7          The fact that the mattress and sheets had holes does not rise to the level of a

8    punitive condition.  Compare Miller v. Fairman, 872 F.Supp. 498, 504 (N.D. Ill. 1994) (having

9    detainee sleep on wet mattress infested with insects states a claim).

10         M.    Books

11         Plaintiff was not allowed to bring books from Atascadero and if he ordered books,

12   he would have to donate them to the library and then check them out from the book cart.  Sumahit

13   Depo. at 72:10-20.  Clay disputes this, averring that inmates are allowed to order books, which

14   can be donated to the library or placed with the inmate's property after the inmate is finished with

15   the book.  Clay Decl. ¶ 69.

16         Ultimately, this dispute is not material.  Plaintiff does not allege he was prevented

17   from ordering any book he desired; moreover he does not recall losing any books as a result of the

18   policy.  Sumahit Depo. at 74:22.  He cannot show that this policy infringed his First Amendment

19   rights.  See Bell, 441 U.S. at 550.

20         N.    Food

21         Food was served on rotation: those at the beginning of the rotation got their meals

22   hot, while those at the end often got cold food.  Sumahit Depo. at 75:11-18.  Cellside and SHU

23   were usually served last.  Id. at 76:2-4.

24         Because SHU and cellside were used for detention, the meals were often served in

25   styrofoam containers, which hold less food.  Id. at 75:19-25.  According to Clay, however,

26   /////

1   inmates received meals in styrofoam containers only when on suicide watch or as yet unassigned

2   to a cell.  Clay Decl. ¶ 52.

3          Once again, any dispute in these facts is not material.  While an inmate, whether a

4   civil detainee or a penal committee, is entitled to adequate food, a complaint of cold food, without

5   more, does not state a claim of punitive conditions.  Harrison v. Moketa/Motycka, 485 F.Supp.2d

6   652, 655-56 (D.S.C. 2007).

7          O.      Condition Of Cells And Shower

8          Plaintiff was required to clean a cell when he first moved into it, whereas at

9   Coalinga or Atascadero officials sanitize a cell after someone moves out.  Sumahit Depo. at

10  106:12-17.  Jail officials provide cleaning supplies.  Id. at 106:24-25; Clay Decl. ¶¶ 47-48.

11  According to Clay, all inmates are required to clean their cells and housing units with supplies

12  provided by the jail.  Clay. Decl. ¶¶ 47-48.

13         Requiring an inmate to clean his cell is not inherently punitive and plaintiff has

14  provided no information suggesting he was singled out for punishment by the requirement that he

15  maintain the cleanliness of his living space.  Hause v. Vaught, 993 F.2d 1079, 1085 (4th Cir.

16  1993).

17         There was mildew in the SHU shower, but jail officials would not give plaintiff

18  bleach to clean it.  Sumahit Depo. at 109: 24-25.  Nevertheless, plaintiff does not aver that he was

19  unable adequately to clean the shower with the materials provided.

20         Defendant is entitled to summary judgment on this claim.

21         P.      Equal Protection

22         In his second amended complaint, plaintiff alleges that the conditions at Tehama

23  County Jail violated his right to equal protection of the laws because other civil detainees are not

24  held in such conditions.  Second Am. Compl. at 10-11.

25         "The Equal Protection Clause of the Fourteenth Amendment commands that no

26  State shall deny to any person within its jurisdiction the equal protection of the laws, which is

1  essentially a direction that all persons similarly situated should be treated alike." City of Cleburne

2  v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (internal quotation and citation omitted).

3   Plaintiff has not identified the "other" civil detainees who allegedly were not held

4  in the same conditions nor specified the conditions in which this unidentified group was held.  It

5  may be that plaintiff seeks to compare his situation to those detained in accordance with the

6  Lanterman-Petris-Short Act, Cal. Welf. & Inst. Code §§ 5000, et seq, or as mentally disordered

7  offenders as defined in Cal. Penal Code § 2962(a).  However, in Munoz v. Kolender,

8  208 F.Supp.2d 1125 (S.D. Cal. 2002), the court recognized that those detained pending

9  commitment under the SVPA are not similarly situated to either group for purposes of equal

10  protection analysis.  Id. at 1136, 1140-41.   Plaintiff has made no attempt to show that he is

11  similarly situated to these groups.

12   Q. Defendant Clay In Individual Capacity

13   Plaintiff testified that he has never had contact with defendant Parker and was not

14  aware of any act or omission by defendant individually rather than as a policy maker that caused

15  the alleged constitutional violations outlined in the complaint.  Sumahit Depo. at 22:4-12.

16  Liability under the Civil Rights Act can adhere only upon a showing of a defendant's personal

17  participation.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Plaintiff has not shown

18  defendant Parker's liability as an individual rather than as a policy maker.  He is entitled to

19  summary judgment in this regard.

20   IT IS HEREBY RECOMMENDED that defendant's motion for summary

21  judgment (docket no. 68) be granted in part and denied in part as detailed below:

22   1.  Granted as to plaintiff's claims that he was denied access to the courts and

23  hampered in his ability to contact counsel; that his ability to practice his religion was restricted;

24  that he was denied access to medical and mental health care and was required to make co-pays for

25  medical visits; that his non-legal mail was read; that he was subjected to strip searches; that his

26  right to privacy was violated because officers could see him in the shower and on the toilet; that

his right to privacy in his medical records and therapy sessions was violated; that his clothing and

mattress were inadequate; that he was left in the booking area for long periods of time; that he

received cold food; that his First Amendment rights were abridged by the book donation policy;

that he suffered from unsanitary conditions and from being compelled to clean his own cell; that

he was denied adequate access to the dayroom while housed in SHU and as to any claim arising

from 2000; as well as to any claim against defendant Parker in his individual capacity; and

2.   Denied as to plaintiff's claims that his telephone calls were monitored; that he

was restrained when taken to and from court; that he was denied adequate outdoor exercise while

housed in both the SHU and cellside; and that he was denied adequate access to the dayroom

while housed cellside.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 3, 2009.

_____

U.S. MAGISTRATE JUDGE

2

suma2605.msj

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26